IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-76,270






DEMONTRELL LAMAR MILLER, Appellant



v.



THE STATE OF TEXAS








ON DIRECT APPEAL FROM CAUSE NO. 241-1251-08


IN THE 241ST DISTRICT COURT


SMITH COUNTY






 Alcala, J. delivered the opinion of the Court in which Meyers, Price,
Womack, Keasler, Hervey, and Cochran, JJ., joined. Keller, P.J., joined, except
for point 8, in which she concurred. Johnson, J., concurred in the judgment.


O P I N I O N



 This is a direct appeal filed by Demontrell Lamar Miller, appellant, who was
convicted in November 2009 of capital murder. Tex. Penal Code § 19.03(a)(8). Based on
the jury's answers to the special issues set forth in the Texas Code of Criminal Procedure
Article 37.071, sections 2(b) and 2(e), the trial court sentenced appellant to death. See Tex.
Code Crim. Proc. art. 37.071, § 2(g). (1) After reviewing appellant's twenty-eight points of
error, we conclude they are without merit. Consequently, we affirm the trial court's
judgment and sentence of death.

Factual Background

 At 12:56 p.m. on Sunday, June 1, 2008, emergency responders were dispatched to an
apartment where appellant lived with his girlfriend, Ceola Pinson; their infant son, Jakayden
("Ty"); and two-year-old Kelynn, who was Ceola's son from a previous relationship. 
Paramedics noted that Kelynn was cold, non-responsive, and had no heartbeat. His
underwear contained bloody stool. Kelynn was taken by ambulance to the hospital, where
he was pronounced dead at 1:35 p.m. The doctor who pronounced him dead noted that
Kelynn's core body temperature was 91.1 degrees Fahrenheit and his body was in rigor
mortis. Appellant was charged with intentionally or knowingly causing the death of Kelynn
Pinson, (2) an individual younger than six years of age, by striking him with his hand, foot, and
unknown hard and blunt objects, and by striking him against unknown hard and blunt objects. 


 Kelynn's paternal grandmother, Linda Franklin, testified that Kelynn had stayed with
her family the week before he died, and he was fine when she and Kelynn's father, Kelvin
Arterberry, took him back to Ceola's apartment on Friday night. Kelynn spent about half of
every month with Linda. During a previous visit a couple of weeks earlier, Linda noticed
that Kelynn was sore in the area of his rib cage under his arm when she tried to pick him up. 
When she asked him what had happened, he said that appellant threw him into a wall. She
asked Kelynn where his mother was when that happened, and Kelynn said that she was on
the floor.

 Ceola acknowledged in her testimony that Kelynn was sore in the area of his rib cage
under his arm when she tried to pick him up a few weeks before his death, but she denied
knowing how it had happened. Ceola also testified that she had told appellant not to spank
Kelynn any more after she discovered red welts on Kelynn's body. On another occasion,
Kelynn's shoulder was sore and he had trouble lifting his arm, but Ceola thought that these
symptoms were caused by his sliding down into the space between the bed and the wall while
he was sleeping.

 Linda testified that Kelynn often cried when she took him home, especially if Ceola
was not there. To stop Kelynn from misbehaving at her house, Linda sometimes threatened
to take him home, and Kelynn would become fearful and say, "No." Ceola also
acknowledged that Kelynn would become fearful if she threatened to tell appellant that he
was misbehaving. She stated that Kelynn did not "take to" appellant in the way he took to
others, and she acknowledged that she once asked Kelynn why he did not like appellant. In
his second statement to police, appellant denied that Kelynn was afraid of him, but he
admitted that Kelynn knew not to come into the room or interrupt when appellant was
watching TV or playing video games.

 During Kelynn's week-long stay with Linda shortly before his death, Linda bathed
him every day, and she did not notice any bruising or injuries except for some scratches on
his legs that he got from running through her neighbor's rose bushes. Kelynn's father,
Kelvin, also testified and confirmed that Kelynn had been fine when they dropped him off
at Ceola's apartment on Friday night. Kelvin identified a photograph of him and Kelynn
together that he had taken with his cell phone on Friday morning. In that picture, Kelynn was
smiling and did not have any visible bruising.

 Ceola also testified that Kelynn had been fine when Linda and Kelvin dropped him
off with her on Friday night. She stated that she and the children spent a quiet evening at
home. She and Kelynn sat on the couch and read books together. Appellant was not there
for most of the evening. When appellant returned from a club around 3:00 a.m., he called
Ceola to unlock the front door for him, and he went to bed. The family went out to eat after
appellant woke up between 1:00 p.m. and 2:00 p.m. on Saturday. Appellant and Ceola
decided to go to Dallas with some friends that afternoon and left the children with Ceola's
friend, Dakeidra Choice. Dakeidra testified that she babysat Kelynn many times. On that
evening, Kelynn seemed to have a normal appetite, and she did not notice anything wrong
with him. Kelynn rode a "Big Wheel" around the apartment and walked to the mailboxes
with Dakeidra and her children. Two other adults who were present in Dakeidra's apartment
that evening also testified that Kelynn seemed fine. Some time after supper, Kelynn asked
for and was given a snack, which he ate. Dakeidra did not notice any injuries or bruises
when she gave Kelynn a bath and put him to bed after 10:00 p.m. Kelynn and Ty were
sleeping when Ceola and appellant came by around 2:00 a.m. on Sunday to pick them up.

 Ceola testified that on the way home, Kelynn woke up and complained that he was
thirsty, but he went back to sleep after they got home. She heard a thump while she was
taking a bath and she called out to Kelynn, who said that he was all right. Before she left for
work around 5:30 a.m. on Sunday, Ceola saw Kelynn asleep in his bed. She checked his
pull-up, which was clean, and she moved him to the couch so that when he woke up, he could
watch cartoons without disturbing appellant. Kelynn did not wake up, but he squirmed to get
comfortable on the couch. When Ceola stopped by the apartment around 9:00 a.m. to drop
off baby formula for Ty, Kelynn was still asleep on the couch, and she did not notice
anything wrong with him. She spoke with appellant for a few minutes and then went back
to work.

 At 12:40 p.m., Ceola received a telephone call from appellant, telling her to come
home right away because something had happened to Kelynn. She told appellant to call
9-1-1, and she started for home. When she arrived, the front door was locked, and she yelled
for appellant to open it. After appellant opened the door, Ceola and her neighbor, Yolanda
Williams, entered the apartment. Kelynn was lying on the living-room floor. Ceola asked
appellant whether he had called 9-1-1, and then without waiting for an answer, she called
9-1-1 herself. Yolanda attempted to revive Kelynn by performing cardiopulmonary
resuscitation ("CPR"). At that point, Ceola observed a bruise developing around Kelynn's
eye. Paramedics arrived about four minutes after Ceola called 9-1-1, and Yolanda carried
Kelynn outside to them. Ceola accompanied Kelynn in the ambulance, but he never regained
consciousness. A friend who met her at the hospital testified that while they were waiting,
Ceola was hysterical, and she kept asking appellant questions, but appellant hung his head
and did not say very much.

 In appellant's statements to police, he acknowledged that Kelynn seemed fine on
Saturday afternoon, and Kelynn was still fine when they picked him up from Dakeidra's
apartment. Appellant heard Ceola leave for work around 5:30 a.m. on Sunday morning, but
he stayed in bed and went back to sleep. Around 7:00 a.m., he woke up to give Ty a bottle. 
He then went back to bed. Later, when Ceola called, he told her that they were out of baby
formula. Kelynn was still asleep when Ceola dropped off the formula, and appellant went
back to bed after she left. Around 11:30 a.m., appellant got out of bed and woke Kelynn up
because he thought Kelynn might be hungry. Appellant fixed Kelynn a sandwich and some
cereal with milk, which Kelynn ate. Kelynn asked appellant to take him swimming, and
appellant told him no. However, after appellant went back into his bedroom to watch
television, he changed his mind and told Kelynn they could go swimming.

 To get him ready to go to the pool, appellant removed Kelynn's orange shirt and dirty
pull-up and used two "wet wipes" to clean Kelynn before dressing him in underwear and
plaid shorts. Appellant placed the used wipes, together with the dirty pull-up, inside a cereal
box in the trash. Appellant did not notice any injuries on Kelynn's body except for one
bruise on his left shoulder. Kelynn was in a good mood and was excited about going
swimming when appellant took him and Ty to the pool.

 Appellant related that after they had been at the pool for a few minutes, Ty started
crying, so appellant told Kelynn to sit in a chair by the pool while he carried Ty back to their
second-floor apartment to get a baby bottle. Appellant left Kelynn alone for only a couple
of minutes but when he looked outside, he could not see Kelynn. He stepped out onto the
breezeway and loudly called Kelynn's name twice, but he received no response, so he left Ty
in the apartment and hurried down to the pool.

 When appellant returned to the pool, he saw that Kelynn was holding onto the pool
ladder and floating with his face in the water. He thought that Kelynn was dead. However,
after appellant pulled Kelynn out of the water and delivered a single open-handed blow to
his chest, Kelynn jumped up, opened his eyes wide, and asked for something to eat. 
Appellant carried him back to the apartment because Kelynn was too sluggish to walk up the
stairs by himself. Kelynn coughed up a white mucus-like substance onto appellant's
shoulder. When they got back into the apartment, appellant wiped the substance off with a
black shirt. Appellant sat Kelynn down on the couch and gave him Sprite in a sippy cup, and
then went to look for some dry clothes to change him into. When appellant next looked at
Kelynn, he saw that his eyes were rolling back in his head. Kelynn's breathing and heartbeat
were not normal, so appellant began performing CPR. He stopped to call Ceola, who told
him to call 9-1-1, but he did not call 9-1-1 because he was scared and trying to do CPR. He
was still administering CPR when he heard Ceola at the front door. Appellant got up to let
her in, and their neighbor "Yawny" accompanied Ceola into the apartment and began
performing CPR on Kelynn while Ceola called 9-1-1.

 Appellant added or changed some details in his second statement to police. 
Specifically, in his second statement, appellant related that, after Ceola dropped off the baby
formula for Ty, appellant went to the bedroom and watched an 80-minute movie before
Kelynn woke up. Appellant also stated that Ceola did not tell him to call 9-1-1 when he told
her that something had happened to Kelynn. Appellant further added that Kelynn coughed
something up onto the carpet while appellant was attempting to perform CPR, and appellant
turned him over to try to let the substance drain out of Kelynn's mouth. Appellant moistened
a towel and used it to wipe the mess. He had used the same towel earlier when Kelynn
coughed up a white substance on their way back from the pool.

 In both his statements to police, appellant failed to mention that he had a phone
conversation with his cousin, Antron Gardner, that day. However, Gardner testified that he
and appellant spoke on the telephone around noon, and they talked about the good-looking
girls they had seen when they were at a club together on Friday night. Gardner's phone
records, which were introduced into evidence, indicated that appellant called Gardner's
number three times around 11:58 a.m., and they spoke at 12:34 p.m. in a call that lasted 50
seconds. Gardner testified that he did not answer appellant's initial calls because he was
sleeping, but he called appellant back when he woke up. After they talked for a few seconds,
appellant told him he needed to go because he had left Kelynn at the pool. Gardner testified
that appellant sounded calm during that conversation, but when Gardner saw him at the
hospital around 4:00 p.m., appellant cried and stated that he was "going to hell." Ceola
testified that, after that day, she never asked appellant what had happened, and appellant
never told her, but he did tell her that Kelynn's "blood was on [his] hands." She
acknowledged that she later told a psychologist that Kelynn would still be alive if she had
left appellant. She testified that she did not know why she said that.

 Deputy Sheriff Clifton Hunter, the apartment complex's courtesy officer, testified that
he unlocked the gate to the pool at 12:30 p.m. on Sunday and saw no evidence that anyone
was there or had been there. He also testified that he received a call on his cell phone as he
was leaving the pool area, and he stayed outside on the breezeway in front of his second-floor
apartment for several minutes while he was talking on the phone. His cell-phone records
confirmed that he received a call at 12:31 p.m., and he testified that the call lasted for about
three minutes. He had a view of the pool from the breezeway in front of his apartment. 
Appellant's apartment also faced onto the breezeway and had a view of the pool. Deputy
Hunter testified that he would have been able to see anyone going back and forth between
appellant's apartment and the pool, but he did not see anyone. In addition, he would have
been able to hear a noise at the pool if someone fell in, and he would have heard anyone who
called out from the breezeway to someone in the pool area. However, he did not see or hear
anything like that while he was outside. Officer James Holt, who secured the pool area after
he responded to the 9-1-1 call, testified that he saw no evidence that anyone had been at the
pool that day.

 Casey DuPont, a forensic scientist, testified about blood tests and DNA analyses that
she had conducted on items that had been recovered from Kelynn and from the apartment
following Kelynn's death. Kelynn's orange tank top had multiple areas of red staining,
which tested presumptively positive for blood. DuPont conducted a deoxyribonucleic acid
("DNA") analysis on a stain near the neck area and obtained a DNA profile that matched
Kelynn's. The plaid shorts and underwear that Kelynn was wearing when he was taken to
the hospital contained a large amount of fecal matter as well as a large amount of brown
staining that tested presumptively positive for blood. DuPont could not obtain a DNA profile
because DNA would be degraded by the presence of fecal matter.

 A cereal box containing two "wet wipes" had been found in the trash. One wipe had
dark material that resembled the fecal matter found on Kelynn's shorts. The other wipe had
lighter stains. Both wipes tested presumptively positive for blood. DuPont did not obtain
a DNA profile because it appeared that the majority of the dark stain was fecal matter, with
blood as a minor component.

 A black T-shirt that purportedly belonged to appellant was tested. It had a white stain
that appeared to be of biological origin and did not test presumptively positive for blood. 
However, a DNA profile obtained from the stain was consistent with Kelynn's, indicating
that the substance was fluid from Kelynn's body. 

 A section of carpet that had been cut from the living room floor had a large
reddish-brown stain that tested presumptively positive for blood, and DuPont obtained a
partial DNA profile that was consistent with Kelynn's. 

 A white towel recovered from the living room floor had eighteen areas of red staining
on the towel that tested presumptively positive for blood. DuPont conducted a DNA analysis
on one area and obtained a DNA profile that was consistent with Kelynn's.

 Dr. Reade Quinton, the Dallas County Medical Examiner who performed the autopsy,
described the condition of Kelynn's body and the numerous bruises and internal injuries that
he had sustained. Kelynn's stomach contained only dark brown fluid, which was not
consistent with his having eaten any food on Sunday morning unless he vomited afterward. 
The bruises on Kelynn's body probably would have been visible within half an hour, and
certainly no later than a couple of hours, after the impacts that caused them. Dr. Quinton
opined that Kelynn's internal abdominal injuries were inflicted by multiple blunt-force
impacts which most likely occurred around the same time, although the injuries could have
been inflicted over the course of several hours or even over the course of a day. Kelynn
sustained a number of tears to the mesentery that were probably inflicted within thirty hours
of death, including a severe tear that was probably inflicted within three hours of death. This
tear would have been immediately followed by active bleeding into the abdominal cavity,
which would have caused severe pain. Kelynn's distress would have been readily apparent
to his caregivers and most likely would have prevented him from engaging in ordinary
activities like eating and playing. Kelynn's injuries would have produced immediate
symptoms that would have grown continually worse until he died. Although in some cases
a child might live for several days with a torn mesentery, Dr. Quinton was unaware of any
child who had lived that long after suffering injuries as extensive as Kelynn's.

 Dr. Quinton opined that Kelynn would not have died immediately. If Kelynn was
non-responsive when emergency responders reached him at 12:56 p.m., then his abdominal
injuries were present before 11:30 a.m. "Based on the way the injuries looked," Dr. Quinton
doubted that Kelynn would have been very communicative by 11:30 a.m., and certainly he
would not have been hungry. Dr. Quinton opined that appellant's account of events, in
which Kelynn was alert and wanting to go swimming around 11:30 a.m., became
unconscious in the water but quickly revived, was asking for something to eat and was
drinking from a sippy cup around 12:35 p.m. or 12:40 p.m., but then suddenly went into
distress and was non-responsive by 12:56 p.m., was not medically likely.

 Dr. Quinton further testified that, based on the location and severity of Kelynn's
abdominal injuries, they were not the result of CPR or efforts to revive him. In addition, the
autopsy revealed a previously fractured rib that had begun healing but had been broken again
within thirty hours of Kelynn's death. Based on the unusual posterior location of the fracture
and the fact that Kelynn incurred the same injury twice in the same unusual location, it was
very unlikely that this injury was accidental.

 Dr. Stephen Pustilnik, the Chief Medical Examiner for Galveston County, testified for
the defense. He acknowledged that Kelynn's injuries were dramatic, but he believed that
some of them were at least twenty-four hours old and that the mesenterial tearing was
inflicted a day or more before Kelynn's death. On cross-examination, he acknowledged that
he had told Dr. Quinton that he thought the mesenterial tearing was inflicted at least eight
hours before death. He also acknowledged that bruises like those seen on Kelynn's skin
would probably become apparent within thirty minutes of the impacts that caused them.

 Dr. Harry Wilson, a pediatric pathologist, testified for the State. He had reviewed the
autopsy results and observed that Kelynn's brain was swollen, which indicated that Kelynn
did not die immediately after he was injured and that he had probably gone into shock. Dr.
Wilson also opined that, based on the coloring of some of Kelynn's abdominal tissues, he had
suffered a previous internal abdominal injury that was roughly a week old. The new
mesenterial tears were probably inflicted between one and four hours before his death. Dr.
Wilson opined that Kelynn would have been in obvious pain and distress because of the
blood pooling in his abdomen, and he would have lost consciousness as a result of his brain
swelling. Kelynn's distress from these injuries would have been apparent to his caregivers. 
Dr. Wilson also testified that if Kelynn's caregivers on the Friday and Saturday before his
death observed that he seemed normal and that he did not have any noticeable bruising, then
Kelynn did not have these injuries when he was with them. Dr. Wilson opined that
appellant's account of events leading up to Kelynn's death had to be false.

Sufficiency of the Evidence at Guilt Phase


 In point of error one, appellant alleges that the evidence is insufficient to support his
conviction for capital murder. Specifically, he complains that many adults had access to
Kelynn during the time period when the fatal injuries could have been inflicted. Appellant
argues that evidence that he was the most likely perpetrator is insufficient to sustain the
verdict.

 In determining whether the evidence is sufficient to support a conviction, a reviewing
court must consider all of the evidence in the light most favorable to the verdict and
determine whether, based on that evidence and reasonable inferences therefrom, a rational
fact finder could have found the essential elements of the crime beyond a reasonable doubt.
Jackson v. Virginia, 443 U.S. 307, 318-19 (1979); Hooper v. State, 214 S.W.3d 9, 13 (Tex.
Crim. App. 2007). This standard gives full play to the responsibility of the trier of fact fairly
to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts. Lucio v. State, 351 S.W.3d 878, 894 (Tex. Crim.
App. 2011). Each fact need not point directly and independently to the guilt of the appellant,
so long as the cumulative force of all the incriminating circumstances is sufficient to support
the conviction. Hooper, 214 S.W.3d at 13.

 The evidence in this case shows that appellant was Kelynn's sole caregiver when the
fatal injuries were inflicted. Although expert medical testimony acknowledged that a child
could survive injuries like those inflicted on Kelynn for several days, expert testimony
established that it was highly unlikely that a child with injuries as severe as Kelynn's would
survive for more than a few hours. The expert testimony explained that a child who had
suffered injuries like those inflicted on Kelynn would immediately experience symptoms that
would grow continually worse and that his distress would be apparent to his caregivers. 
Kelynn's blood was found in stains on his own clothes and on various items in the apartment
that appellant had identified while telling police his versions of events leading up to Kelynn's
death. In addition, it was undisputed that the visible multiple bruises on Kelynn's body
would have appeared within a couple of hours of the impacts that caused them, and no adult
saw those bruises until after Kelynn had been in appellant's sole care for several hours.

 Ceola and appellant, as well as other adults who took care of Kelynn on Friday and
Saturday, stated that Kelynn seemed fine through the time when Ceola and appellant picked
up the children from Dakeidra's apartment at 2:00 a.m. on Sunday. Ceola stated that she
checked on Kelynn before she left for work around 5:30 a.m. and that he squirmed after she
moved him to the couch. Ceola and appellant both stated that appellant was alone with the
children after Ceola left for work, and that Kelynn was still asleep when Ceola stopped by
mid-morning to drop off baby formula for Ty. Kelynn seemed fine during this period.

 Appellant's versions of events from the time that Ceola left him alone with Kelynn
and Ty until the time that Ceola returned to the apartment and called 9-1-1 were not
consistent with testimony that no one had been to the pool, evidence of Kelynn's blood on
Kelynn's clothes and inside the apartment, and autopsy results reflecting that Kelynn had
been beaten to death. The State's medical experts testified that appellant's account of
Kelynn's condition and behavior that day was not medically likely and had to be false.

 The State also presented evidence that appellant had abused Kelynn in the past,
including breaking his rib by throwing him into a wall and spanking him so hard that red
welts appeared on his skin. Appellant told Gardner at the hospital that he was "going to
hell," and he later told Ceola that Kelynn's "blood was on [his] hands." A jury could
reasonably infer from this evidence that appellant caused Kelynn's fatal injuries. See Lucio,
351 S.W.3d at 895. The cumulative force of all the incriminating circumstances is sufficient
to support the conviction. See Hooper, 214 S.W.3d at 13. Point of error one is overruled.

Summaries of Testimony

 Appellant presents three points of error challenging the admission of summaries of
the testimony of Dr. Quinton, Detective David Matthews, and Ceola Pinson. In point of error
two, appellant complains that the trial court erred by admitting the prosecutor's summary of
Dr. Quinton's testimony because the summary is inadmissible hearsay and does not fall
within the ambit of Rules 107 or 1006 of the Texas Rules of Evidence. (3) See Tex. R. Evid.
107, 1006. He argues that the harm analysis should be conducted under Texas Rule of
Appellate Procedure 44.2(a) because the error violated the Confrontation Clause. See Tex.
R. App. P. 44.2(a). Appellant cites to two opinions that address the admissibility of
summaries under Rule 1006. See Tex. R. Evid. 1006; Wheatfall v. State, 882 S.W.2d 829
(Tex. Crim. App. 1994); Callahan v. State, 937 S.W.2d 553 (Tex. App.Texarkana 1996,
no pet.). In support of his allegation of harm, appellant argues that submitting the opinion
of one expert in note form as evidence, when other experts with different opinions also
testified about the matter but none of their testimony was submitted in note form, had the
effect of accentuating Dr. Quinton's opinion over other expert witnesses' opinions.

 When the prosecutor offered the notes into evidence at trial, appellant objected that
the admission of the summary violated the rules of procedure, "particularly . . . procedural
due process with respect to my client's constitutional rights under the Fourteenth Amendment
and denies him a fair trial." He complained that the jury should not be able to take
"summarized conclusions of the prosecutors" into the jury room and that allowing this was
fundamentally unfair and denied appellant equal protection. The prosecutor responded that
the summary was Dr. Quinton's conclusions that had already been presented to the jury and
that it was admissible as a witness statement.

 Appellant's point of error on appeal, challenging the notes under the rules of evidence,
does not comport with his trial objections on the grounds of rules of procedure, due process,
equal protection, and "fairness." See Tex. R. App. P. 33.1(a). Furthermore, his claims are
inadequately briefed because appellant provides no legal argument for his complaints that
the summary is inadmissible hearsay and that its admission violated the Confrontation
Clause. See id. Rule 38.1(h); see also Lucio, 351 S.W.3d at 896. Therefore, we decline to
address this claim. Point of error two is overruled.

 In point of error three, appellant complains that the trial court erred by admitting the
prosecutor's summary of Detective Dennis Matthews's testimony because the summary is
inadmissible hearsay and does not fall within the ambit of Rule 107. See Tex. R. Evid. 107. 
He argues that the harm analysis should be conducted under Texas Rule of Appellate
Procedure 44.2(a) because the error violated the Confrontation Clause. See Tex. R. App. P.
44.2(a). Appellant describes the summary as "conclusions of the prosecutor from the
statements and conclusions from the [sic] Detective Matthews with respect to the evidence
that's been presented." In support of his complaint, appellant states, "Pursuant to the
argument contained Issue No. 9. [sic] Appellant incorporates said arguments by reference
and argues that the admission of State's Exhibit 175 was error." We infer from this language
that appellant means to incorporate his argument from point of error two into point of error
three. He asserts that the error was harmful because "it unnecessarily drew the attention of
the jury to a particular piece of evidence."

 At trial, appellant objected to the admission of this summary on grounds that it was
"not evidence" and that it contained conclusions of the prosecutor with respect to the
evidence that had been presented. He argued that the "best evidence" of appellant's
statements to police was the audiovisual recordings of those statements and that the jury
should be able to review those recordings "without the benefit of the aid and assistance of
the prosecutor's and witness' [sic] conclusions with respect to" the contents of the
recordings. He further objected that admitting the summary would violate his constitutional
rights to procedural due process and equal protection and would deny him a fair trial.

 Appellant's point of error on appeal does not comport with his trial objections. See
Tex. R. App. P. 33.1(a). Furthermore, his claims are inadequately briefed because he provides
no legal argument for his complaints that the summary is inadmissible hearsay and contains
inadmissible conclusions and that its admission violated the Confrontation Clause. See Tex.
R. App. P. 38.1(h). Therefore, we decline to address this claim. Point of error three is
overruled.

 In point of error four, appellant complains that the trial court erred by admitting the
prosecutor's summary of Ceola Pinson's testimony because the summary is inadmissible
hearsay and does not fall within the ambit of Rule 107. See Tex. R. Evid. 107. In support of
his complaint, appellant "incorporates by reference the arguments made in Issue No. 9 [sic]." 
We infer from this language that appellant means to incorporate his argument from point of
error two into this point of error.

 At trial, appellant objected to the admission of this summary on grounds that its
admission violated procedural due process and equal protection and deprived appellant of his
right to a fair trial. Counsel also objected that admitting the summary, which was the
prosecutor's notes, undermined the rationale behind the rule that the jurors themselves were
not allowed to take notes, and that the exhibit contained the prosecutor's conclusions.

 Appellant's point of error on appeal does not comport with his trial objections. See
Tex. R. App. P. 33.1(a). Furthermore, his claims are inadequately briefed because appellant
provides no legal argument for his complaints that the summary is inadmissible hearsay and
that its admission violated the Confrontation Clause. See id. Rule 38.1(h). Therefore, we
decline to address this claim. Point of error four is overruled.

Autopsy Photograph

 In his fifth point of error, appellant asserts that the trial court erred by applying the
Rule 403 balancing test to State's Exhibit 103 because the prejudicial effect of this autopsy
photograph outweighed any probative value. See Tex R. Evid. 403. Appellant acknowledges
that the photograph is relevant but argues that the prosecutor's need for it was minimal, the
photograph was gruesome, and the degree of mutilation from the autopsy played on jurors'
emotions and pushed them toward an irrational verdict.

 State's Exhibit 103 is an approximately life-sized autopsy photograph of Kelynn's
body viewed from behind, with the skin of his arms, legs, neck, and back reflected. The
photograph measures approximately 30 inches by 23 inches. Kelynn's feet and the top of his
head are not visible because they extend past the edge of the photograph, but all of the rest
of his body is visible. The photograph is in color.

 The trial court held a hearing outside the presence of the jury to determine the
admissibility of this and other autopsy photographs. Dr. Quinton testified at the hearing that
the photo showed one of the procedures that medical examiners follow in a case where there
are multiple injuries. He explained that the skin of the entire back and extremities was
reflected so that the examiner could look for any additional bruising that might not be
apparent externally. The photo showed two small bruises on the midline of Kelynn's back
and additional bruises on the right side of the back. Dr. Quinton confirmed that the
photograph was a visual depiction of the injuries that he planned to describe to the jury. It
showed the location of bruising on Kelynn's back and the fact that there were multiple
impacts to his back area. Dr. Quinton acknowledged that the photograph was gruesome.

 On cross-examination, defense counsel described this photograph as representing "a
human fillet of the body of that child." Dr. Quinton again explained that the photo depicted
part of the procedure that the medical examiner followed in evaluating the body for injury. 
He explained that Kelynn's dark pigmentation made it difficult to see external bruising and
that this procedure enabled the examiner to see bruising that was deeper than the surface of
the skin. Although the bruises on the right side of Kelynn's back were visible externally, the
two midline bruises were not visible externally or in the other photographs that would be
presented to the jury.

 Dr. Quinton acknowledged that these injuries could be shown in a diagram or in
another photograph that was a close-up of the midline bruises that did not show "the entire
thing." He also acknowledged that he could simply describe the injuries verbally. Dr.
Quinton, however, opined that the photo would be better than a diagram for demonstrating
the location, extent, and coloring of the injuries.

 Defense counsel objected at the pretrial hearing and at trial on grounds that the
photograph was so prejudicial that it would deprive appellant of procedural due process,
equal protection, and a fair and impartial trial. She argued that a diagram or another
photograph could be used to assist Dr. Quinton in explaining those injuries. She
acknowledged that the photo was relevant but asserted that its prejudicial effect would
completely outweigh its probative value.

 The trial court found that the photo was admissible and made detailed findings on the
record to explain its reasoning. The court cited Gallo v. State, 239 S.W.3d 757, 762 (Tex.
Crim. App. 2007), for the general principle that a photograph is admissible if verbal
testimony concerning the matter depicted in the photograph is also admissible. The court
noted that, as this Court stated in Gallo, Rule 403 favors the admission of relevant evidence
and carries a presumption that relevant evidence will be more probative than prejudicial. Id.
(citing Tex. R. Evid. 403). The court pointed out that in Gallo, the appellant complained of
the admission of "numerous, repetitious, [and] gruesome" autopsy photographs of the
three-year-old victim, but in the instant case, only one autopsy photograph was at issue. Id.
As in Gallo, the challenged photograph depicted injuries that were not visible externally and
that were inflicted shortly before death. Although the photograph was gruesome, there was
no danger that the jury would attribute the mutilation caused by the autopsy procedure to the
defendant.

 The trial court also referred to Rojas v. State, 986 S.W.2d 241, 250 (Tex. Crim. App.
1998), which held that autopsy photos showing injuries to the victim's pelvic area, although
those injuries were not the cause of death, were probative of the appellant's mental state at
the time of the murder. They were evidence of the specific circumstances of the murder and
of the fact that the appellant had omitted information from his statement to police. Id. at 249-50. The trial court also discussed Avila v. State, No. AP-74,142, 2003 Tex. Crim. App.
LEXIS 142, *18-19 (Tex. Crim. App. July 2, 2003) (not designated for publication), which
held that photographs depicting mutilation by the medical examiner were admissible when
they showed bruising or other damage that was attributable to the defendant but not visible
externally and, therefore, were highly relevant to the manner of death.

 The trial court considered whether, as in Avila, the ultimate issue was seriously
contested and whether the State had other convincing evidence to establish the ultimate issue. 
The State had the burden to prove that appellant intentionally or knowingly caused the death
of the victim. Thus, the State had to prove, not only that appellant inflicted the injuries that
led to the victim's death, but also that the injuries were intentionally inflicted with the intent
to cause death. 

 Finally, the trial court cited Martin v. State, 475 S.W.2d 265, 267 (Tex. Crim. App.
1972), overruled on other grounds by Jackson v. State, 548 S.W.2d 685, 690 (Tex. Crim.
App. 1977), for the holding that if a photograph is competent, material, and relevant to the
issue on trial, it is not rendered inadmissible merely because it is gruesome or might tend to
arouse the passions of the jury. The trial court found that, in considering the testimony in this
case and the elements in the indictment, the probative value of the photo was not
substantially outweighed by the danger of unfair prejudice.

 The admissibility of photographs over an objection is within the sound discretion of
the trial court. Sonnier v. State, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995). In this case,
State's Exhibit 103 was the only photograph offered to show the midline bruises on Kelynn's
back that were not visible externally. It showed the location of multiple bruises on Kelynn's
back and multiple impacts. Dr. Quinton testified that this photograph demonstrated the
location, extent, and coloring of the injuries more effectively than a diagram. Under the
circumstances of this case, we cannot say that the trial court abused its discretion in ruling
that the probative value of Exhibit 103 was not substantially outweighed by the danger of
unfair prejudice. See Martinez v. State, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). Point
of error five is overruled.

Lesser-Included-Offense Instructions


 In point of error six, appellant asserts that the trial court erred by denying his
requested jury instruction on the lesser-included offense of felony murder, in violation of
Article 36.19. See Tex. Code Crim. Proc. art. 36.19. He contends "from reading the record
as a whole that a rational juror could have found that the [a]ppellant may have intended to
commit the felony . . . injury to a child, but did not intend to cause the victim[']s death."

 A charge on a lesser-included offense should be given when (1) the lesser-included
offense is included within the proof necessary to establish the offense charged; and (2) there
is some evidence that would permit a rational jury to find that the defendant is guilty of the
lesser offense but not guilty of the greater. See Rousseau v. State, 855 S.W.2d 666, 672-73
(Tex. Crim. App. 1993). Felony murder is a lesser-included offense of capital murder. 
Salinas v. State, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005). Thus, the first criterion is
satisfied.

 With regard to the second criterion, however, appellant fails to identify any evidence
in the trial record that affirmatively shows that he did not intentionally or knowingly cause
Kelynn's death but instead only intentionally, knowingly, recklessly, or with criminal
negligence caused the injuries that led to Kelynn's death. See Schweinle v. State, 915 S.W.2d
17, 19 (Tex. Crim. App. 1996); see also Tex. Penal Code §§ 22.04(a), 22.04(c)(1). Nor does
he identify any evidence that is subject to two different interpretations, one of which would
negate an element of the offense of capital murder and establish felony murder as a valid,
rational alternative. See Schmidt v. State, 278 S.W.3d 353, 362 & n.19 (Tex. Crim. App.
2009). Thus, appellant has failed to show that there is some evidence that would permit a
rational jury to find that he is guilty of the lesser offense but not guilty of the greater. 
Appellant's sixth point of error is overruled.

 In point of error seven, appellant asserts that the trial court erred in denying his
requested jury instruction on the lesser-included offense of criminally negligent homicide,
in violation of Article 36.19. His entire argument in support of this point is that he
"incorporates by reference the argument contained in Issue No. 14 [sic]." We infer from this
language that appellant means to incorporate his argument from point of error six into this
point of error. Thus, this point of error is inadequately briefed. See Tex. R. App. P. 38.1(i);
see also Lucio, 351 S.W.3d at 896-97. Appellant's seventh point of error is overruled.

Cross-Examination of Punishment Character Witnesses


 In points of error eight through eleven, appellant asserts that the trial court erred by
overruling his objections to the improper examination by the prosecutor, of his character
witnesses in the punishment phase of trial. He argues in his eighth point of error that the
prosecutor's examination of Joshua Smith injected race into the trial, which was not relevant
to any matter concerning appellant's character, and that the prosecutor's question was
manifestly improper and constituted prosecutorial misconduct. Appellant also argues that,
even if the evidence had some relevance under Rule 401, any probative value was
outweighed by its extremely prejudicial effect under Rule 403. See Tex. R. Evid. 401, 403. 
In support of finding harm, appellant argues that the prosecutor's improper questioning
violated due process and amounted to structural error requiring an automatic reversal on
punishment.

 On direct examination, Joshua testified that he met appellant when they were
sophomores in high school. He testified that they were very close friends and they played
a variety of sports together. They were both members of the high-school football team. 
Joshua described appellant as a leader on the team and a hard worker who was voted most
likely to succeed. They also played pool and video games together, and they spoke daily by
phone. They took a trip to Dallas together the day before Kelynn was killed. Joshua testified
that he visited appellant at appellant's mother's house on many occasions and observed
appellant interacting with his siblings. Appellant's family was very close, and his siblings
looked up to him as a "father figure." Appellant's mentally challenged brother, Dexter,
looked up to appellant, wanted to be like him, and was happy to be around him. Appellant
was also very close to his mother, and when he was away from home, he would call her and
check up on the family.

 Joshua further testified that he and appellant went to clubs together a couple of times
each month and to gambling boats in Shreveport three or four times each month. Joshua
thought that Ceola was jealous of the time that he and appellant spent together. He was
shocked to learn that appellant had been charged with capital murder because that was
uncharacteristic of appellant. He testified that he and appellant were a lot alike and that
appellant was a great friend.

 On cross-examination, the prosecutor asked Joshua, "You remember talking on the
phone to [the] defendant and making some statements about the white folks in the court
room? I can refresh your memory with the tape. You remember that?" Defense counsel
asked to approach the bench. At the bench conference, defense counsel objected to the
prosecutor's line of questioning on grounds that it was not relevant and was "quite
prejudicial," arguing that it made no difference to the trial how Joshua felt about white
people. The prosecutor responded that Joshua's statement to the defendant, made during a
telephone conversation on the previous evening after the trial adjourned for the day, was,
"You're looking sharp today. White folks don't like it, all our folks being in there," and then
the defendant answered, "Today went all right."

 Defense counsel again asserted that the prosecutor should not interject race into the
trial and that this line of questioning was not relevant to any issue. The prosecutor responded
that it was relevant because 

 what [Joshua is] talking about is that they've been loading this courtroom up,
and by his own statement it's an effort to make us uncomfortable. And I think
it goes directly to his bias to testify and his motive to testify. He's talking
about the white folks don't like us being down there, I want to know what he's
talking about.


Defense counsel argued again that Joshua's comment was not relevant, adding, "The bias
would go toward his friendship with the defendant, not toward the racial remarks that he may
have made during the course of the conversation."

 The trial court overruled the objection, finding that this questioning was relevant to
show Joshua's motive and bias in testifying. Defense counsel then inquired whether the
court would give a limiting instruction on that basis, and the court stated there was nothing
on which to instruct. The trial court stated, "If he's on the phone with the defendant making
those type statements, it's something that the jury can consider in weighing his testimony, the
credibility of his testimony, motive or bias of his testimony. That's the ruling."

 The prosecutor then asked Joshua a compound question: "[I]sn't it true when talking
to the defendant, you said, 'You're looking sharp today. White folks don't like it, all our
folks being down there,' what did you mean?" Joshua asked him to repeat the question. The
prosecutor responded, "Sure. You told the defendant, four minutes and 25 seconds into your
phone call, you said, 'You're looking sharp today. White folks don't like it, all our folks
being in there.' What are you talking about? Because I can play it for you to refresh your
memory." Joshua stated that he did not remember. The prosecutor then asked, "Are you
saying you didn't say it?" Joshua responded, "I'm not saying I didn't say it, I just don't recall
saying that."

 Defense counsel again asked to approach the bench. She objected to the introduction
of the recording, arguing that because the witness did not deny making the statement, there
was no point in playing the recording. The prosecutor asserted that he could play the
recording unless the witness "unequivocally admits to making the statement." The court
overruled the objection.

 Defense counsel also objected on the ground that a proper predicate had not been laid
for the introduction of the recording. The prosecutor responded that he was not even "using"
or "introducing" the recording, he was just impeaching the witness with it, which was "totally
different." The court overruled the objection, and the prosecutor played the recording to the
jury. The prosecutor then asked Joshua if that was his voice, and Joshua responded that he
could not say whether it was his voice. The prosecutor played the recording a second time
and again asked Joshua if that was his voice. Joshua then admitted that it was his voice.

 The prosecutor then asked, "So what is it when you say that white folks don't like it? 
Who are you talking about?" Joshua responded, "Just people in general." The prosecutor
persisted, "Well, no, you said that the white folks didn't like it. Didn't like what?" Joshua
answered, "I mean, I don't know . . . I was meaning us being outside in the hallway." The
prosecutor again asked, "What white folks don't like it? I mean, you made the statement?" 
Joshua responded again, "I mean, people don't like us being out in the hallway." The
prosecutor kept on: "Who don't?" Joshua responded again, "Just people in general."

 A party may cross-examine a witness to expose his bias or interest in testifying. Tex.
R. Evid. 613(b). The trial court has discretion as to the extent of cross-examination of a
witness for the showing of bias or as to credibility, and its decision is not subject to reversal
on appeal absent a clear abuse of discretion. Cantu v. State, 939 S.W.2d 627, 635 (Tex. Crim.
App. 1997). However, a party is not entitled to impeach a witness on a collateral matter. 
Ramirez v. State, 802 S.W.2d 674, 675 (Tex. Crim. App. 1990).

 Joshua's detailed description of his close friendship with appellant provided ample
evidence of his bias and motivation in testifying. The prosecutor's questions concerning
Joshua's arguably racist comment about the "white folks" were not relevant to his credibility
and were, at best, cumulative of already-introduced evidence of Joshua's bias in testifying
as a character witness for appellant. These questions arguably created a risk of unfair
prejudice by placing Joshua's own character in issue and portraying him as a racist who
envisioned the trial as a conflict between the "white folks" and "our folks."

 By asking Joshua if he made the "white folks" comment, the prosecutor elicited a
response from a character witness for the sole purpose of introducing extraneous evidence
to contradict the witness's response and place the witness's own character into issue. Such
questioning was improper. See TXI Transp. Co. v. Hughes, 306 S.W.3d 230, 242 (Tex. 2010)
(citing Ramirez, 802 S.W.2d at 675 (parties may not impeach on collateral or immaterial
matters), and Delamora v. State, 128 S.W.3d 344, 363 (Tex. App.Austin 2004, pet. ref'd)
("[a] party may not cross-examine a witness on a collateral matter, then contradict the
witness's answer")); but see Cantu, 939 S.W.2d at 635 (asking character witness if she
thought offense was funny and then introducing letter she had written which contradicted her
denial was not improper impeachment on collateral matter). Thus, any marginal relevance
of this line of questioning was substantially outweighed by the potential for unfair prejudice.

 For non-constitutional error, as here, the improper admission of evidence is harmless
when it does not affect the substantial rights to a fair sentencing trial. See Coble v. State, 330
S.W.3d 253, 280 (Tex. Crim. App. 2010). In making a harm analysis, we examine the entire
trial record and calculate, as much as possible, the probable impact of the error upon the rest
of the evidence. Id. The error is harmless if it did not influence the jury or had only a slight
effect. Id.

 In this case, Joshua was only one of several character witnesses who testified on
appellant's behalf, and only his testimony was affected. In addition, Joshua's bias and
character were challenged without objection in other ways. For example, the prosecutor
questioned Joshua about the fact that he and appellant's other friends and family members
were wearing purple at the courthouse. Joshua testified, without objection, that appellant's
mother had told them to wear purple in support of appellant and the family because it was
the color of royalty. The prosecutor also questioned Joshua about an incident in which he
received stolen shoes while appellant waited for him in the car, and another incident in which
Joshua was present while appellant and appellant's sister confronted and beat up a woman
who was dating appellant's sister's boyfriend. In light of this unobjected-to questioning
about Joshua's bias and character, any error in admitting the "white folks" line of questioning
was harmless in its impact on the jury's determination of Joshua's credibility. Furthermore,
nothing in the prosecutor's questioning suggested that the improper racial comment was
made by appellant or with his assent, and, therefore, no statement was attributable to him. 
We conclude the error was harmless because it did not affect appellant's substantial rights. 
Point of error eight is overruled.

 In his ninth point of error, appellant complains that the trial court erred in overruling
his objection to the State's improper cross-examination of his sister, Chineyere Jordan. He
complains that the prosecutor's questioning of Chineyere about her mother's criminal history
was outside the bounds of proper cross-examination. He incorporates by reference his
argument from point of error eight, and states that there is nothing in the rules of evidence
or case law that would render this testimony admissible. He asserts that the criminal record
of a third party is irrelevant and prejudicial. He contends that harm has been established
because, in closing argument, the prosecutor described appellant's character witnesses as "a
parade of thugs."

 After defense counsel questioned Chineyere, the prosecutor approached the bench and
stated that, on cross-examination, he intended to question Chineyere about her mother's
criminal history. He stated that this line of questioning was admissible to correct a false
impression left by her testimony during direct examination. Specifically, Chineyere had
testified on direct examination that appellant became his siblings' primary caregiver when
he was still in middle school. She explained that their mother was not at home to take care
of them because she was always at work. In fact, however, their mother was often not at
home because she was in jail. Defense counsel objected to the prosecutor's proposed line of
questioning, arguing that the defense had not left a false impression simply by questioning
Chineyere about the long hours that her mother worked. The trial court overruled the
objection, explaining that the impression had been left with the jury that their mother's
absence from the home was the result of her working two jobs, and the State could offer
evidence to correct this impression.

 The prosecutor then questioned Chineyere: "In fact, your mother, Julia Jordan, was
out of the house because - why don't you tell me how many times she's been arrested since
you and Demontrell lived in the house with her?" Chineyere responded, "How would I know
that?" The prosecutor then began questioning Chineyere about specific arrests: "Well,
because isn't it true that in 1994 - how old would you have been then?" Chineyere answered
that she would have been four years old. The prosecutor then asked, "[Your mother] was
arrested for possession of a controlled substance, was she not?" Chineyere responded that
she did not know and that she did not ask. The prosecutor then asked about another arrest:
"Okay, January 17th of 1996 she was arrested on two cases of theft, was she not?" 
Chineyere responded that she did not know, and she would have been six years old at that
time. The prosecutor then asked Chineyere what her mother had been arrested for in 2001,
and Chineyere again responded that she did not know.

 After similar questions and answers about numerous additional arrest dates, Chineyere
stated that she did not know about her mother's arrests and that she did not care to know such
things about her mother. The prosecutor continued, "So how many times has she been in jail
when you were growing up?" Chineyere again stated that she did not know, and she added
that she did not remember her mother being in jail. She explained, "[I]f my mom was
arrested, they not going to tell us, they probably tell us something else. So I don't remember
my mom being arrested."

 An appellate court will not disturb a trial court's evidentiary ruling absent an abuse
of discretion. Winegarner v. State, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). The general
rule is that a party is not entitled to impeach a witness on a collateral matter. Ramirez, 802
S.W.2d at 675. However, when a witness leaves a false impression concerning a matter
relating to his or her credibility, the opposing party is allowed to correct that false
impression. Id. at 676. Similarly, a party may open the door to otherwise inadmissible
evidence to rebut or correct a false impression for which he was responsible. Whitaker v.
State, 286 S.W.3d 355, 364 n.8 (Tex. Crim. App. 2009) (citing Renteria v. State, 206 S.W.3d
689, 697 (Tex. Crim. App. 2006)).

 Chineyere testified that, from the time appellant was in middle school, he was his
siblings' primary caregiver because their mother was never at home because she was always
at work. The trial court did not abuse its discretion by determining that this testimony left a
false impression concerning a matter relating to Chineyere's credibility as a character
witness. This testimony was relevant to Chineyere's credibility in at least two ways. First,
if Chineyere did not know or remember that their mother was often in jail when they were
growing up, then this fact was relevant to the jury's assessment of Chineyere's ability to
accurately observe and recall details about her home life and her immediate family members,
including appellant. Second, if Chineyere knew that their mother was often in jail when they
were growing up, but she chose to omit this information from her explanation of why their
mother was never home, then this fact was relevant to the jury's assessment of her candor.

 In addition, the trial court did not abuse its discretion by determining under Rule 403
that the probative value of questioning Chineyere concerning her mother's criminal history
was not substantially outweighed by the danger of unfair prejudice. See Tex. R. Evid. 403.
As mentioned above, this questioning arguably corrected a false impression and had some
limited probative value concerning Chineyere's reliability and credibility as a character
witness. The probative value of the substantive information concerning their mother's arrest
record was minimal, but the risk of unfair prejudice to appellant was also minimal because
the arrests were not appellant's, and although they were numerous, they were for non-violent
offenses. Furthermore, the jury became aware of the mother's criminal history through
unobjected-to testimony by another witness, and, therefore, the prejudicial effect of the
evidence from Chineyere's testimony was mitigated. We conclude the trial court did not
abuse its discretion by overruling the appellant's objection that the testimony was overly
prejudicial. Point of error nine is overruled.

 In point of error ten, appellant asserts that the trial court erred in overruling his
objection to the prosecutor's improper cross-examination of Reverend Allen Dotson
concerning his knowledge of appellant's mother's criminal history. Appellant asserts that
questioning a character witness about the criminal record of a third party is "totally irrelevant
and prejudicial to the [a]ppellant." It appears from appellant's argument that he also means
to complain about the fact that, during this examination, the prosecutor misrepresented
appellant's mother's criminal record by describing her as a convicted felon. Appellant
incorporates by reference his argument from point of error eight, adding that there is nothing
in the rules of evidence or case law that would render this testimony admissible. He asserts
that he was harmed because the prosecutor emphasized this sort of improper testimony when,
in closing argument, she described appellant's character witnesses as "a parade of thugs."

 The record reflects that the prosecutor asked Dotson, "[Appellant's mother] is a
convicted felon, is she not?" He responded that she was. Defense counsel then asked to
approach the bench and objected that this questioning constituted collateral impeachment of
a witness who was not on the stand, and that appellant's mother had no final felony
convictions that were available for impeachment. In response, the prosecutor asserted that
he was not impeaching appellant's mother but rather was testing Dotson's knowledge of
appellant's family. The prosecutor reviewed his records and acknowledged that appellant's
mother did not have a final felony conviction but instead had received deferred-adjudication
probation for a felony offense. He stated that he would correct this information. After the
bench conference, the prosecutor asked Dotson whether appellant's mother "was actually on
a third degree felony deferred adjudication probation" for a term of ten years. Dotson
acknowledged that she was.

 Appellant's complaints on appeal do not comport with his objections at trial. See Tex.
R. App. P. 33.1(a). Moreover, any error in this line of questioning was cured when similar
information was elicited without objection during the examination of other witnesses. See
Coble, 330 S.W.3d at 282 & n.82. Defense counsel did not object when the prosecutor asked
Ceola during the guilt phase, "Do you know that Julia Jordan is - has a felony conviction for
drugs?" Ceola responded, "I don't know the whole story, but . . . when they were doing the
whole thing at the hospital about the custody thing, [] they had mentioned it." Also, as
previously discussed in point of error nine, during the punishment phase, the prosecutor
questioned appellant's sister, Chineyere, about their mother's arrests. Although defense
counsel objected generally to this line of questioning, the objection was properly overruled. 
Counsel did not lodge a separate objection when the prosecutor asked Chineyere, "When did
[your mother] go on the ten years deferred adjudication probation for a felony?" Thus, the
same information about appellant's mother was elicited without objection during the
examination of other witnesses. Point of error ten is overruled.

 In point of error eleven, appellant complains that the trial court erroneously overruled
his objections to the prosecutor's improper cross-examination of Terrance Green.
Specifically, the trial court allowed the prosecutor to question Terrance about a fight that he
had been in, when this fight did not result in a conviction and appellant was not part of it. 
Appellant contends that this extraneous bad act had nothing to do with appellant's character,
and its probative value was substantially outweighed by its prejudicial effect under Rule 403. 
See Tex. R. Evid. 403. He incorporates his arguments from points of error seven, eight, and
nine, and urges that the "net effect of this improper cross examination of [a]ppellant's
character witnesses [was] in effect [to] demonize them and [undermine] their credibility to
such an extent that harm has been shown."

 The record reflects that the same questions and answers had already come in without
objection before the complained-of examination, and so any error in overruling appellant's
objection was cured. See Coble, 330 S.W.3d at 282 & n.82. Terrance had already
acknowledged that he had gotten into a fight at the State Fair that resulted in his removal
from the grounds by the time defense counsel objected to the prosecutor's continued
questioning about this matter. Because the same testimony had already come in, the
admission of this testimony will not result in reversal. Point of error eleven is overruled.

Future Dangerousness

 In point of error twelve, appellant contends that the evidence is insufficient to support
the jury's affirmative answer to the future-dangerousness special issue. He asserts that the
evidence adduced at trial indicated that he was twenty years old and the product of a good
upbringing. He played football and received a football scholarship to Arkansas Tech, where
he attended college for a little over a year before he moved back to Tyler. His character
witnesses all described him as a gentle, loving, and dedicated family member. Appellant's
future-dangerousness expert testified that, of the factors that could increase an offender's risk
for future violence, youth was appellant's only risk factor. Therefore, argues appellant, "[t]he
evidence taken as a whole is legally insufficient for a rational jury to make the determination
that the appellant would be a future danger beyond a reasonable doubt."

 When reviewing the sufficiency of the evidence supporting the jury's future-dangerousness determination, we view the evidence in the light most favorable to the verdict
and determine whether, based on that evidence and reasonable inferences therefrom, any
rational trier of fact could have found beyond a reasonable doubt that there is a probability
that appellant would commit criminal acts of violence constituting a continuing threat to
society. See Martinez v. State, 327 S.W.3d 727, 730 (Tex. Crim. App. 2010); see also
Wardrip v. State, 56 S.W.3d 588, 593 (Tex. Crim. App. 2001). We do not weigh the evidence
of future dangerousness against countervailing evidence. See Brooks v. State, 323 S.W.3d
893, 894 (Tex. Crim. App. 2010) ("a reviewing court is required to defer to a jury's
credibility and weight determinations"); see also McGinn v. State, 961 S.W.2d 161, 168-69
(Tex. Crim. App. 1998) (once the rationality of the future-dangerousness prediction is
established, it is impossible to determine whether the prediction is nevertheless wrong or
unjust because of countervailing evidence).

 In determining the special issues, the jury is entitled to consider all of the evidence
presented at both the guilt and punishment stages of trial. Art. 37.071, § 2(d)(1); see also
Young v. State, 283 S.W.3d 854, 863 (Tex. Crim. App. 2009). The jury may consider a
variety of factors when determining whether a defendant will pose a continuing threat to
society. Wardrip, 56 S.W.3d at 594 & n.7. The circumstances of an offense, if "severe
enough," may alone sustain an affirmative finding as to a defendant's future dangerousness.
Rosales v. State, 841 S.W.2d 368, 381 (Tex. Crim. App. 1992).

 In this case, the circumstances of the offense were severe. The jury had before it the
medical evidence of Kelynn's numerous and extensive injuries. There was expert testimony
that, after two-year-old Kelynn was fatally injured, he would not have died immediately, and
his distress would have been obvious to his caregivers. Yet appellant failed to seek help for
Kelynn. Instead, he spoke with his cousin, Gardner, on the phone and told him that he had
left Kelynn alone at the pool. The evidence recovered from the apartment included Kelynn's
blood-stained shirt, "wet wipes" stained with blood and fecal matter, a section of the living-room carpet stained with Kelynn's blood, and a towel with multiple blood stains. Kelynn's
underwear and shorts contained blood and fecal matter. The jury could reasonably infer from
this evidence that, after appellant fatally injured Kelynn, he attempted to set the stage for the
story he had concocted. Appellant called Ceola and told her to come home, but did not call
9-1-1. Additionally, appellant gave two separate false statements to the police about the
circumstances in which Kelynn was fatally injured.

 Further, the jury had before it evidence of appellant's prior violent conduct. There
was evidence that appellant had physically injured Kelynn on previous occasions, including
breaking his rib by throwing him into a wall and spanking him so hard that red welts rose on
his skin, and that Kelynn was afraid of appellant. Although Ceola denied that appellant had
physically abused her, her downstairs neighbors testified that they heard loud noises that
sounded like domestic disturbances coming from her apartment several nights a week. The
noises included banging, crashing, children crying, and the sound of someone being hit and
thrown around while a woman screamed and yelled for it to stop. On one occasion, they
called 9-1-1 and reported hearing an adult man, an adult woman, and children yelling and
crying. They reported that they heard sounds of things slamming and banging and a woman
screaming, "You've broken my ear drum, it's bleeding." The neighbors called the police that
night because the sounds were so bad that they were afraid that the man was going to kill the
woman. When the police arrived, appellant was uncooperative and refused to identify
himself. Ceola recalled that episode when she testified. She denied that appellant had
physically assaulted her, but acknowledged that appellant had locked her out of their
bedroom, keeping their infant, Ty, in the room with him because he was angry that Kelynn
wanted to stay at the apartment with her instead of going to the store with appellant. She
admitted that he had been throwing things around and slamming doors and that she had asked
appellant's mother to come to their apartment to help her.

 In addition to evidence of appellant's prior violent conduct toward Kelynn and Ceola,
the jury had before it evidence that appellant had committed violent assaults against others
with little or no provocation. In high school, appellant once confronted and fought with
another student after his cousin told him that the student had said something rude to her. 
Appellant, who was 6'4" and 240 pounds, would also join in with others to attack a single,
smaller victim. For example, the year after he graduated from high school, appellant,
Gardner, Terrance, and another friend assaulted a seventeen-year-old student at a local high-school dance. The victim, Deandre Oliver, testified that he and Terrance had been
"dance-battling" when Terrance pushed him. Appellant then punched him in the face,
causing him to fall down. Then, Gardner hit him with a chair. Deandre testified that he was
kicked several times as he lay on the ground. He did not know why appellant punched him
because the two of them had never had a problem.

 In another incident that occurred about two months before the present offense,
appellant and Joshua accompanied appellant's sister, Chineyere, to an apartment complex
where Dramon Green, the father of her child, lived. Appellant drove them there in his
mother's van at 2:30 a.m., ostensibly to pick up some clothes and toys for Chineyere's baby.
When they arrived at the apartment complex, however, they saw that Dramon and his other
girlfriend, Chelsea Chimney, were sitting in Chelsea's parked car with the windows rolled
down. Appellant parked his van directly behind Chelsea's car so that it was blocked in.
Chineyere then walked over to the car, opened the passenger door, and told Dramon to get
out. He started to get out, and Chineyere appeared to be walking back to the van, but then
Chelsea heard appellant say, "Go get that bitch." Chineyere then turned around and
approached the driver's side door of Chelsea's car, yelling at Chelsea to get out. As she
continued yelling, Chineyere reached in through the open window and poked Chelsea on the
head. Chelsea told Chineyere that she was not going to fight her and asked her to get away
from the car and move the van so she could leave, but Chineyere continued yelling and
poking at her. Chelsea put her car into reverse, but Chineyere would not get away from her
and appellant would not move the van.

 Eventually, Chelsea put her car back into park and got out to fight with Chineyere. 
After a couple of minutes of fighting, Chelsea knocked Chineyere down, got on top of her,
and started hitting her. Appellant then jumped in and punched Chelsea in the face, causing
her to fall down. Appellant repeatedly kicked and kneed Chelsea as she lay on the concrete. 
She managed to get away from him and ran to the sidewalk where there were onlookers, but
no one came forward to help her. Chineyere followed Chelsea and continued fighting with
her until the police arrived. The responding officer who spoke with appellant after the fight
testified that appellant explained that he had punched and kicked Chelsea because he "wasn't
going to let his sister get whooped."

 Finally, there was evidence that appellant had disciplinary problems in jail following
his arrest, including an incident in which he repeatedly disobeyed a guard and then grabbed
for his hand, so that another guard had to intervene to resolve the situation. In view of this
evidence, we conclude that a rational trier of fact could have found beyond a reasonable
doubt that there is a probability that appellant would commit criminal acts of violence
constituting a continuing threat to society. See Lucio v. State, 351 S.W.3d 878, 885-86 (Tex.
Crim. App. 2011). Point of error twelve is overruled.

Challenges to Death-Penalty Scheme Appellant's points of error thirteen through twenty-eight challenge the death-penalty
scheme in Texas. In points of error thirteen and fourteen, appellant asserts that Article 37.071
violates the Eighth Amendment because it allows the jury too much discretion in determining
who should live and who should die and lacks minimal standards and guidance for avoiding
the arbitrary and capricious imposition of the death penalty. In addition, the mitigation
special issue sends mixed signals to the jury, such that any verdict with respect to mitigation
is intolerable and unreliable. We have rejected similar arguments before, and appellant has
not persuaded us to revisit them here. See Coble, 330 S.W.3d at 297; Feldman v. State, 71
S.W.3d 738, 757 (Tex. Crim. App. 2002); Ladd v. State, 3 S.W.3d 547, 573 (Tex. Crim. App.
1999); Raby v. State, 970 S.W.2d 1, 9 (Tex. Crim. App. 1998). Points of error thirteen and
fourteen are overruled.

 In point of error fifteen, appellant asserts that Article 37.071 violates due process by
implicitly placing the burden of proving mitigation onto appellant rather than requiring the
jury to find the mitigation issue against appellant under the "beyond a reasonable doubt"
standard. We have rejected similar arguments before. See Blue v. State, 125 S.W.3d 491, 501
(Tex. Crim. App. 2003); Raby, 970 S.W.2d at 9. Point of error fifteen is overruled.

 In point of error sixteen, appellant asserts that the trial court erred by overruling his
motion to hold Article 37.071, sections 2(e) and 2(f), unconstitutional under the Texas
Constitution's due-course-of-law provision because the statute shifts the burden of proof to
appellant. Appellant is obligated to point out to this Court where in the record he preserved
error. See Tex. R. App. P. 33.1(a), 38.1(h); see also Davis v. State, 313 S.W.3d 317, 352-53
(Tex. Crim. App. 2010). However, appellant does not indicate where in the record he filed
such a motion and obtained a ruling on it. Therefore, he has failed to demonstrate that he
preserved error. Point of error sixteen is overruled.

 In point of error seventeen, appellant asserts that the death-penalty scheme violates
due process by failing to place the burden on the State to prove the absence of sufficient
mitigating circumstances beyond a reasonable doubt in violation of Apprendi v. New Jersey,
530 U.S. 466 (2000), and its progeny. We have repeatedly rejected similar arguments. See
Coble, 330 S.W.3d at 296; Blue, 125 S.W.3d at 501; Raby, 970 S.W.2d at 9. Point of error
seventeen is overruled.

 In point of error eighteen, appellant asserts that the death-penalty scheme violates due
process of law and his right to be free from cruel and unusual punishment by requiring at
least ten "no" votes for the jury to return a negative answer to the future-dangerousness
special issue or a positive answer to the mitigation special issue. He argues that this
requirement constitutes an impermissible built-in dynamite charge, injects arbitrariness into
sentencing, and violates Mills v. Maryland, 486 U.S. 367 (1988), because of the risk that
jurors will believe that they have to find sufficient mitigating factors unanimously before
they can answer the mitigation special issue affirmatively. We have rejected these arguments
in previous cases. See Williams v. State, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009);
Druery v. State, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); Prystash v. State, 3 S.W.3d
522, 536 (Tex. Crim. App. 1999). Point of error eighteen is overruled.

 In point of error nineteen, appellant asserts that the death-penalty scheme violates his
rights to be free from cruel and unusual punishment, to an impartial jury, and to due process
of law because of vague, undefined terms in the punishment-phase jury instructions. 
Specifically, appellant complains that the trial court did not define "probability," "continuing
threat to society," and "criminal acts of violence," which are terms that are so vague and
indefinite that their inclusion violated his fundamental rights, such that there is no rational
process for imposing the death penalty and no rational review on appeal. We have repeatedly
rejected these claims. See Coble, 330 S.W.3d at 297. Point of error nineteen is overruled.

 In points of error twenty and twenty-one, appellant asserts that the death-penalty
scheme violates his right to be free from cruel and unusual punishment, due process of law,
and the Texas Constitution's due course of law provision because it is impossible to
simultaneously restrict the jury's discretion to impose the death penalty while also allowing
the jury unlimited discretion to consider all evidence militating against imposition of the
death penalty. (4) He relies primarily on Justice Blackmun's dissenting opinion in Callins v.
Collins, 510 U.S. 1141 (1994). This Court and the United States Supreme Court have
rejected this claim. See Turner v. State, 87 S.W.3d 111, 118 (Tex. Crim. App. 2002) (citing
Callins, 510 U.S. at 1141-42 (Scalia, J., concurring)). The death-penalty scheme narrows the
class of death-eligible defendants and provides the jury with a vehicle to fully consider
mitigating evidence. See Saldano v. State, 232 S.W.3d 77, 107 (Tex. Crim. App. 2007); see
also McFarland v. State, 928 S.W.2d 482, 520 (Tex. Crim. App. 1996) (rejecting argument
that death-penalty scheme is per se unconstitutional because the requirement that the jury
consider mitigating evidence contradicts the requirement of "structured discretion"). Points
of error twenty and twenty-one are overruled.

 In point of error twenty-two, appellant asserts that the trial court erred in overruling
his motion to hold Article 37.071, sections 2(c) and 2(f), unconstitutional for failing to
require the jury to consider the issue of mitigation in violation of the Eighth Amendment. 
He argues that capital-murder statutes that have been held constitutional all require that the
jury be instructed that it must consider all mitigating evidence. Appellant does not indicate
where in the record he filed and obtained a ruling on such a motion. See Tex. R. App. P.
33.1(a) & 38.1(h); see also Davis, 313 S.W.3d at 352-53. Therefore, appellant has failed to
demonstrate that he preserved error. Moreover, the record shows that the jury in this case
was instructed to fully consider and give effect to all evidence, including mitigating evidence. 
See Heiselbetz v. State, 906 S.W.2d 500, 508 (Tex. Crim. App. 1995) (citing Penry v.
Lynaugh, 492 U.S. 302, 323 (1989)); see also Johnson v. Texas, 509 U.S. 350, 367 (1993)
(appellate courts evaluate jury instructions with a commonsense understanding in the light
of all that has taken place at the trial). Point of error twenty-two is overruled.

 In point of error twenty-three, appellant asserts that the "Penry issue" (5) in Article
37.071 is unconstitutional because it fails to place the burden of proof on the State with
respect to aggravating evidence. He argues that the mitigation special issue is a conduit for
aggravating as well as mitigating factors, and that the mitigation issue invites jurors to weigh
aggravating against mitigating factors. He claims that the jury instruction is silent regarding
the burden of proof as to aggravating factors, which implies that the defense has the burden
to disprove aggravating factors and to prove mitigating factors, rendering the instruction
unconstitutional under the Eighth and Fourteenth Amendments. Appellant adds, in point of
error twenty-four, that the "Penry issue" permits the type of open-ended discretion that was
condemned in Furman v. Georgia. 408 U.S. 238 (1972). We have rejected these claims. See
Coble, 330 S.W.3d at 297; Ladd, 3 S.W.3d at 573; Raby, 970 S.W.2d at 9; see also Williams,
301 S.W.3d at 694. Points of error twenty-three and twenty-four are overruled.

 In point of error twenty-five, appellant asserts that the capital-sentencing scheme is
unconstitutional under the Eighth and Fourteenth Amendments because it does not permit
meaningful appellate review. He argues that the Court is required by Article 44.251 and the
Constitution to review on appeal the sufficiency of the evidence supporting a negative
answer to the mitigation issue. We have rejected similar claims, and appellant has not
persuaded us to revisit them. See Blue, 125 S.W.3d at 504; Cockrell v. State, 933 S.W.2d 73,
92 (Tex. Crim. App. 1996). Point of error twenty-five is overruled.

 In point of error twenty-six, appellant asserts that the trial court erred in overruling
his second motion to set aside the indictment based on constitutional defects of the death-penalty scheme. He does not indicate where in the record he filed and obtained a ruling on
such a motion. See Tex. R. App. P. 33.1(a), 38.1(h); see also Davis, 313 S.W.3d at 352-53. 
Point of error twenty-six is overruled.

 In points of error twenty-seven and twenty-eight, appellant asserts that the cumulative
effect of the constitutional violations committed during his trial proceedings denied him due
process under the United States Constitution and due course of law under the Texas
Constitution. Because we have rejected appellant's individually asserted constitutional
violations, there is no error to cumulate. See Chamberlain v. State, 998 S.W.2d 230, 238
(Tex. Crim. App. 1999); see also Wyatt v. State, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000). (6) 
Points of error twenty-seven and twenty-eight are overruled.

 We affirm the judgment of the trial court.


Delivered: May 23, 2012

 

Do Not Publish
1. Unless otherwise indicated, all references to Articles refer to the Texas Code of
Criminal Procedure.
2. ' ' 
 ' 
 ' 
 
3. Unless otherwise indicated, all references to Rules refer to the Texas Rules of
Evidence.
4. Appellant makes no distinction between his rights under the federal and Texas
constitutions. Therefore, we will treat them as being the same in this context. See Luquis v. State,
72 S.W.3d 355, 364 (Tex. Crim. App. 2002).
5. We infer that appellant uses the term "Penry issue" to refer to the mitigation instructions
set forth in Article 37.071, sections 2(e) and 2(f).
6. As discussed in point of error eight, above, any error with regard to the cross-examination of appellant's character witnesses was non-constitutional error that did not affect his
substantial rights to a fair sentencing trial.